IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


**HAZEL LESSEN, as personal representative
of the wrongful death claim of the estate of
RICHARD DOMMER,**

      **Plaintiff,**

vs.                                                      **No. CIV 06-0002 MV/LAM**

**HARRY TIPTON, ALBERT CHAVEZ,
and ERIC GARCIA,**

      **Defendants.**


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment Requesting Dismissal of Plaintiff's Complaint **[Doc. No. 27]**, filed on December 6, 2006, and fully briefed on October 27, 2008.[1]  Defendants move the court for summary judgment on the basis of qualified immunity.[2]  Having considered the motion, the memoranda in support and in

---

[1] On December 18, 2006, Defendants filed their Unopposed Motion to Stay Proceedings (Doc. No. 34).  On December 22, 2006, the Court granted Defendants' motion and stayed proceedings pending appointment of a personal representative. On February 27, 2007, Plaintiff filed her Unopposed Motion to Stay Proceedings.  On March 9, 2007, the Court entered its Order (Doc. No. 40), staying these proceedings pending a decision on Plaintiff's appeal in the New Mexico Court of Appeals.  On July 23, 2008, the Court granted Plaintiff's Unopposed Motion to Lift Stay of Proceedings and entered an Order lifting the stay (Doc. No. 46).

[2] On January 3, 2007, Plaintiff voluntarily dismissed without prejudice Defendant Douglas Weisheit (Doc. No. 38).  On January 15, 2009, the parties filed a Joint Motion to Dismiss Defendants Harry Tipton and Albert Chavez (Doc. No. 61).  On January 20, 2009, the Court entered its Order, dismissing with prejudice Defendants Tipton and Chavez from this action (Doc. No. 62).   Plaintiff had alleged a deliberate indifference claim against Defendants Tipton and Chavez because they were supervisors at MDC at the time of the incident.  Because these defendant were dismissed, Plaintiff's claim for deliberate indifference in supervision against Defendants Tipton and Chavez is dismissed as moot.

opposition, and the relevant law and being otherwise fully informed, the Court finds that the motion is not well taken and will be **DENIED**.

## I. Factual Background

On February 25, 2004, Richard Dommer ("Decedent") was arrested in Albuquerque and booked into the Metropolitan Detention Center (MDC). Compl. ¶¶5,6. MDC is in a remote area of Bernalillo County. Plaintiff contends there are no surrounding businesses or residences in that area, and the closest pay telephone is more than five miles from the gates of MDC. *Id.* ¶6.

Correctional Medical Services (CMS) provides medical care to inmates pursuant to a contract with the City of Albuquerque. *Id.*¶8. Plaintiff claims that, at the time of Decedent's arrest and booking, he was in need of medical care. *Id.*¶7. CMS assessed Decedent as suffering from drug withdrawal and placed him in on "drug watch." *Id.*¶8.

Decedent spent the night at MDC. *Id.*¶9. Decedent suffered from drug withdrawal through the night and was reported as engaging in "bizarre behavior" at 3:05 a.m., on February 26th. *Id.*¶10. On February 26th, Decedent was released in the early evening hours when the temperature was near freezing. *Id.*¶11. Plaintiff contends Decedent was still disoriented at the time of his release, yet no defendant arranged for medical transport or called his family. *Id.*¶12.

When Decedent was released, he got into the MDC van for transportation to downtown Albuquerque. *Id.*¶16. However, shortly after getting into the van, decedent exited the van and re-entered MDC.[3] *Id.*¶17. Decedent was then released out of the main entrance of MDC.

---

[3] In his response to Defendants' motion for summary judgment, Plaintiff denies Decedent ever got on the van and claims there was no room on the van for Decedent. Pl.'s Resp. at 3. Plaintiff failed to submit evidence supporting these claims. However, Defendants submitted a video showing some inmates getting into a van and then some inmates exiting the van. *See* Defs.' Mem. Supp. Mot. Summ. J.; Ex. E (video). However, the Court cannot identify Decedent among the group of inmates.

*Id.*¶18. Decedent wandered away from MDC and into the desert where he died of exposure that night or the next morning. *Id.*¶19.

## II. Standard of Review

The Court will grant summary judgment when there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). The movant carries the burden of establishing there are no genuine issues of material fact, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1609 (1970), but may discharge its burden by showing there is an absence of evidence to support the non-movant's case, *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554 (1986). Once the movant meets its burden, the burden shifts to the non-movant to demonstrate a genuine issue for trial on a material matter. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). In making its summary judgment determination, the court looks at the pleadings and documentary evidence in the light most favorable to the non-movant, *Deepwater Invs., v. Jackson Hole Ski Corp.* 938 F.2d 1105, 1110 (10th Cir. 1991), and the movant must show beyond a reasonable doubt it is entitled to summary judgment, *Hicks v. City of Watonga, Okla.*, 942 F.2d 737, 743 (10th Cir. 1991). However, once the burden shifts to the non-movant, that party may not rest on its pleadings but must set forth specific facts showing there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553. However, "the mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10 (1986). If the non-movant cannot make such a showing, after adequate time for discovery, summary judgment is mandated. *Celotex Corp.*, 477 U.S. at 322,

106 S.Ct. at 2552.  The Court will consider Defendants' motion for summary judgment in light of these standards.

### III.  Discussion

**A.  Qualified Immunity**

Qualified immunity protects government officials from individual liability in a § 1983 action unless the officials violated clearly established constitutional rights.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982).   When a defendant pleads qualified immunity, the plaintiff must then make a two-part showing.  *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995).  The plaintiff must first demonstrate that the defendant's actions violated a constitutional or statutory right.  *Id.*  The plaintiff must then show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue.  *Id.*  "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity."  *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).  In a recent decision, the United States Supreme Court left to the discretion of the lower courts the order in which a court addresses the two steps involved in the analysis of a claim of qualified immunity.  *Pearson v. Callahan*,  555 U.S. – , – , 129 S.Ct. 808, 818 (2009).

In determining whether the right was clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039 (1987).  The action alleged to have violated a right does not have to have previously been held unlawful, however, "in light of pre-existing law the unlawfulness must be apparent."  *Id.*  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly

4

established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).

**B.  Deliberate Indifference (Serious Medical Needs) Theory**

The right to custodial medical care is clearly established.  Although pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, the Court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983.  *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002).  "A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment."  *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (*citing Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976)).

"'Deliberate indifference' involves both an objective and a subjective component." *Sealock v. Colo.*, 218 F.3d 1205, 1209 (10th Cir. 2000).  For the objective component, a "prisoner must first produce objective evidence that the deprivation at issue was in fact 'sufficiently serious.'" *Mata,* 427 F.3d at 751(*quoting Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970 (1994)).  "[A] medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Hunt v. Uphoff*. 199 F.3d 1220, 1224 (10th Cir. 1999)(*quoting Ramos v. Lamm,*, 639 F.2d 559575 (10th Cir. 1980)).  The subjective component requires "evidence of the prison official's culpable state of mind," which may be fulfilled by showing that the official "[knew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [he] must also draw the inference." *Id*. (quotation omitted).

Plaintiff contends Decedent was disoriented and in need of medical care at the time of his release.  Compl. ¶12.  Plaintiff claims Decedent came into contact with Defendant Garcia who should have noticed Decedent's disorientation and arranged for medical transport or called Decedent's family.  *Id.*  Plaintiff submitted the following evidence in support of his claim that Defendant Garcia was deliberately indifferent to Decedent's medical needs.

On February 26, 2004, at 3:05 a.m., the nurse on duty noted Decedent was engaging in "bizarre behavior."  Pl.'s Resp.; Ex. F.  At 2:15 p.m., on the same day, the nurse noted Decedent was not taking food or water and had some tremors.  *Id.*; *see also* Ex. B, Shannon Dep., p. 25, lines 18-22.

Michael Doiel, an inmate released from MDC on the same day and time as Decedent, testified at his deposition that he was housed in the same pod as Decedent and had the cell directly across from Decedent's cell.  *Id.*, Ex. C, Doiel Dep., pp. 7-8.  Mr. Doiel testified he remembered looking into Decedent's cell and observed Decedent sitting on top of the toilet with his feet inside the toilet and thought Decedent was not "right."  *Id.*, p. 7, lines 22-24.  Mr. Doiel testified that on the day of their release he observed Decedent in the holding cell pacing back and forth "in a corner" and "could tell that something was wrong [with Decedent]."  Pl.'s Resp.; Ex. C, Doiel Dep., p. 7, lines 12-15.  Mr. Doiel testified Decedent "didn't know what was going on" and "was talking to himself."  *Id.*  Finally, Mr. Doiel testified he was an electrician not a doctor "but to me, you could tell that this man was ill, and it just didn't seem right to me that they let him out, going by himself, walking."  *Id.*, p. 17, lines 3-7.

It is not disputed that medical personnel did not discuss Decedent's medical treatment and care with any of the Defendants in this case.  *See* Def.'s Mem. Supp. Summ. J.; Ex. I, Shannon Dep.  Dr. Shannon, CMS Medical Director, testified there was no policy or procedure

requiring CMS to report to releasing officers when a person is being released from the drug detoxification unit at MDC.  Def.'s Mem. Supp. Summ. J.; Ex. I, Shannon Dep., pp. 63-64.  Additionally, Dr. Shannon submitted an affidavit attesting that, for reasons of medical confidentiality, CMS cannot contact an inmate's family or security personnel upon an inmate's release to discuss the inmate's medical condition.  *Id.*; Ex. H, Shannon Aff. ¶7.

Although Decedent was released from the detoxification unit after being in treatment for a short time and while still withdrawing from drugs, nonetheless, Dr. Shannon testified Decedent's condition at the time of his release from the detoxification unit did not require treatment.  *Id.*; Ex. I, Shannon Dep., p. 30, lines 2-12.  Dr. Shannon testified he had no personal knowledge of what "bizarre behavior" Decedent had exhibited but stated "it was important to me that [the nurse] didn't mark agitated or confused."  *Id.*, p. 22, lines 21-25.  Dr. Shannon asserted that at the time of Decedent's release from the detoxification unit "his heart rate is fine" and he was "hydrated enough to not have bad vital signs."  *Id.*., p. 31, lines 16-18.  Dr. Shannon also testified that at 2:15 p.m. on the day of Decedent's release from the detoxification unit and the last time anyone from CMS had contact with Decedent, he "wasn't taking enough [fluids] for our feeling good about it, but his vitals showed good."  *Id.*, p. 31, lines 21-24, p. 48, lines 15-19.  Significantly, Dr. Shannon testified it was on the "second to third day when you're going to see them not eating or not hydrating."  Pl.'s Resp.; Ex. B, Shannon Dep. p.26, lines 2-8.

It is undisputed that Defendant Garcia was the officer in charge of releasing inmates on the day Decedent was released from MDC.  Thus, Defendant Garcia had the opportunity to assess or "eyeball" Decedent when he came in contact with him.  However, there is a genuine issue of fact as to Decedent's condition at the time of his release into the parking lot by Defendant Garcia.  Plaintiff submitted evidence showing Mr. Doiel, a lay person, "recognized

the necessity for a doctor's attention" when he came in contact with Decedent in the holding cell prior to Decedent coming into contact with Defendant Garcia. Plaintiff also established that Dr. Shannon had not seen Decedent and relied on Decedent's records to conclude Decedent was not in need of medical care. Plaintiff established, through Dr. Shannon's testimony and Decedent's medical records, that at 2:15 p.m. Decedent was not taking fluids or food and was exhibiting tremors. Dr. Shannon testified that Decedent was on his second day of detoxification, the second and thirds days of detoxification being the days "when you're going to see them not eating or not hydrating." Significantly, Plaintiff established that after 2:15 p.m. no one from CMS had any further contact with Decedent.

On the other hand, Defendants presented Dr. Shannon's deposition testimony where he testified "there was no sign ever of any disorientation on any of my [medical] documents" and "[Dommer] was actually acting normal on the [video] tapes." Defs.' Mem. Supp. Mot. Summ. J.; Ex. I. The Court has viewed the video tape and cannot determine whether the video tape supports Dr. Shannon's testimony. *Id*.; Ex. E (Video Tape of Dommer at time of release). The video tapes shows several inmates being released at the same time. There is a lot of movement and activity going on at the same time, and the video is not of good quality. The Court cannot determine whether Decedent was or was not "acting normal" on the tape or whether or not he was disoriented. Because there is a factual dispute as to whether Decedent was in obvious need of medical care at the time he came into contact with Defendant Garcia, summary judgment as to this claim is precluded.

**B. Danger Creation Theory**

Defendants claim that, "in order for the danger creation exception to be invoked in this case, first there must be allegations that [the] governmental actor created a danger that caused a

8

private actor to commit violent acts against Mr. Dommer." Defs.' Mem. Supp. Mot. Summ. J. at 6. Because no "such circumstance exists in this case," Defendants contend "Plaintiff's danger creation theory must fail on its face." *Id.* Second, Defendants contend Plaintiff's danger creation theory also fails because "Plaintiff's danger creation theory . . . revolves around an alleged policy violation committed by Defendant Garcia" and "the Tenth Circuit 'has recognized that claims based on violations of state law and police procedure are not actionable under §1983.'" *Id*. at 3. Relying on this understanding of the danger creation theory, Defendants did not adequately address this claim. The Court will address each of Defendants' positions.

First, Defendants mistakenly construe Plaintiff's §1983 claim as alleging a violation of MDC's transportation "practice" or "policy." Plaintiff is alleging a violation of Decedent's substantive due process rights pursuant to the Fourteenth Amendment of the U.S. Constitution. The vehicle through which this type of violation is remedied is 42 U.S.C. §1983. Section 1983 was specifically designed to provide a method for redress of violations of the rights protected under the Fourteenth Amendment by state actors.

In *DeShaney v. Winnebago County Dep't of Soc. Servs*, 489 U.S. 189, 195-97, 109 S.Ct. 998 (1989), the Supreme Court announced the now firmly entrenched rule that the Due Process Clause of the Fourteenth Amendment does not impose a constitutional duty upon a state to protect individuals from *private violence*. Defendants rely on this rule in support of their motion for summary judgment. However, there are two exceptions to this general rule: (1) the special relationship doctrine and (2) the danger creation theory. Plaintiff contends the danger creation theory exception applies to this case.

The "danger creation" theory provides that a state may be liable for an individual's safety "if it created the danger that harmed the individual." *Armijo v. Wagon Mound Public Schools*,

159 F.3d 1253, 1260 (10th Cir.1998). "The key to the state-created cases . . . lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid." *Id.* at 1263. To make out a proper danger creation claim, a plaintiff must demonstrate that (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking. *Id.* at 1262-63.

"When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principal is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs– e.g., food, clothing, shelter, medical care, and reasonable safety– it transgresses the substantive limits on state action set by the . . . Due Process Clause." *Deshaney*, 489 U.S. at 199-200, 109 S.Ct., at 1005 (citation and footnote omitted).

In this case, Decedent was taken into custody and held at MDC, a facility 17 miles from Albuquerque. Defendant Chavez testified to the known danger for <u>anyone</u> at any time walking along the frontage road that parallels I-40. Defendants recognized the safety issues of detaining individuals at this location and their responsibility for the safety of all inmates when they implemented their transportation policy or practice.

Decedent was a member of a limited and specifically definable group.  Dr. Shannon testified it was typical for him to supervise the care of "40 to 50 people withdrawing from different drugs" at MDC and described this group of inmates as "the sickest people in the jail." Pl.'s Ex. B, Shannon Dep., p.23, lines 12-25.  Dr. Shannon also testified all inmates in the detoxification unit wear a "yellow band" that is not removed until the inmate is "off of detox." *Id.,* p. 29, lines 22-25, p. 30, line 1.  Dr. Shannon testified it was not unusual for an inmate to be discharged before the detoxification process had been completed.  This was so because CMS has no hold on an inmate once the inmate is released from jail.  *Id.*, p. 35, lines 1-4.  Dr. Shannon further  testified "we release probably 60 to 70 people a day, and there is no center in Albuquerque to refer them to for ongoing detox, none." *Id.*, p. 33, lines 16-19.

Dr. Shannon testified it was his department's policy and procedure to check on inmates who are released before completing detoxification at the "releasing area." *Id.*, p. 47, lines 17-22. Specifically, Dr. Shannon testified, "We walk through there [releasing area] to make sure we're not putting somebody on the bus from detox that shouldn't be on the bus.  If somebody looks like they're real agitated or real shaky, then they'd go to F3 or Seg 7." *Id.*  However, Dr. Shannon testified this policy and procedure was only followed for inmates released from the detoxification unit who would be on the bus after 8:00 or 9:00 at night. Id., p. 48, lines 24-25. In situations where an inmate is in the detoxification unit and not doing medically well (not stable) at the time of his court release order, Dr. Shannon testified, "I have a responsibility.  I mean if he was unstable when they came to release him, if he was in the infirmary, getting IV's, I certainly would give him his clothes, put him in an ambulance and send him to a hospital." *Id.*; Ex. B, Shannon Dep., pg. 34, lines 1-7.  Thus, Decedent belonged to the group of  inmates undergoing detoxification but released from MDC before completing the detoxification process

11

and released from MDC before 8:00 p.m., when no one from CMS would evaluate their condition at the "releasing area."

As previously noted, MDC is located 17 miles from Albuquerque. Defendant Chavez was a captain in charge of the booking area and responsible for the transportation of individuals released from MDC. Defendant Chavez testified in his deposition regarding the practice of transporting individuals from MDC to downtown Albuquerque. Pl.'s Resp.; Ex. E, Chavez Dep., pp. 45-46. Specifically, Defendant Chavez testified "the jail is 17 miles out of town, so we offer a shuttle to take people downtown." *Id.*, p. 45. Defendant Chavez further testified it would be dangerous for anyone at any time to walk on the frontage road that runs parallel to I-40. *Id.*, p. 46, lines 9-21. That would be the route an individual would typically take to get back to Albuquerque after leaving MDC. Defendant Chavez also testified about the practice in place on February 26, 2004, regarding transportation of inmates once the inmate is released from MDC. The practice was that inmates who did not have a means of transportation upon release were provided a ride to downtown Albuquerque. Inmates that had a ride had to have a waiver and "inmates that have waivers are released to the custody of the name on the waiver and are verified." *Id.*, p.49 (see attachments to Chavez Dep.)(emphasis added).

Defendant Garcia also testified regarding what the practice was on February 26, 2004, in regards to providing inmates with transportation. *See* Pl.'s Resp.; Ex. D, Garcia Dep. Defendant Garcia testified it was the practice that every inmate who did not accept transportation to downtown Albuquerque needed a waiver in their file in order for them to be released into the parking area. *Id.*, p. 12, lines 23-25, p. 13, lines1-11. Defendant Garcia testified inmates with waivers were released to the custody of the individual named on the waiver. *Id.*, p.10, lines 9-12. Defendant Garcia further testified it was his responsibility to check if someone had a waiver

12

before he let the person out the front door. *Id.*, p. 11, lines 1-11.  Significantly, Defendant Garcia testified it was his responsibility to ensure that individuals released into the parking lot actually got into a vehicle. *Id.*, p. 17, lines 11-18.  Therefore, there is no dispute that Defendant Garcia was aware of MDC's transportation policy or practice in place on February 26, 2004.

Considering the location and distance of MDC from Albuquerque, the known danger(s) posed by MDC's location to inmates, the near freezing weather in February, the time of Decedent's release (no last minute check by CMS personnel before being placed on a van), the transportation policy or practice in place on February 26, 2004, and the factual dispute regarding Decedent's mental and physical condition at the time of Decedent's release, the Court cannot find at this juncture that Defendant Garcia was not deliberately indifferent to Decedent's safety needs when he failed to follow MDC's transportation practice or policy in Decedent's case. Moreover, the "danger creation jurisprudence was clearly established as a matter of law by late 1994." *Armijo*, 159 F.3d at 1262.  Accordingly, Defendant Garcia is not entitled to summary judgment on the basis of qualified immunity as to this claim.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment is **DENIED**.

**Dated** this 30th day of March, 2009.

*[signature]*
**MARTHA VAZQUEZ**
**CHIEF UNITED STATES DISTRICT JUDGE**

**Attorney for Plaintiff:**
Joseph P. Kennedy

**Attorneys for Defendants:**
Stephanie Griffin